UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
KINGS AUTOSHOW, INC.,

                Plaintiff,

    -against-

MITSUBISHI MOTORS OF NORTH AMERICA, INC.

                Defendant.
-----------------------------------------------------------X

**OPINION
AND ORDER**

22-CV-07328 (JMW)

**A P P E A R A N C E S:**

Milton Grunwald, Esq.
Karl C. Seman, Esq.
**Grunwald & Seman, PC**
100 Garden City Plaza, Suite 203
Garden City, NY 11530
*Attorneys for Plaintiff Kings Autoshow, Inc.*

Patrick McCormick, Esq.
David Howard Green, Esq.
**Campolo, Middleton & McCormick, LLP**
4175 Veterans Memorial Highway, Suite 400
Ronkonkoma, NY 11779
*Attorneys for Plaintiff Kings Autoshow, Inc.*

Brandon Bigelow, Esq.
Dallin Wilson, Esq.
**Seyfarth Shaw LLP**
2 Seaport Lane, Suite 1200
Boston, MA 02210
*Attorneys for Defendant Mitsubishi Motors of North America, Inc.*

Jeremy Andrew Cohen, Esq.
**Seyfarth Shaw LLP**
620 Eighth Avenue
New York, NY 10018
*Attorney for Defendant Mitsubishi Motors of North America, Inc.*

1

**WICKS,** Magistrate Judge:

> "*Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.*"[1]

Defendant, Mitsubishi Motors North America ("MMNA"), is a manufacturer comprised of 350 automobile dealers spanning the United States.  One such dealer is Plaintiff Kings Autoshow, Inc.  Automobile manufacturers and dealers, such as Mitsubishi, operate under an agreement governing the rights and obligations of the parties.  Compliance with the terms of the agreement is critical for both, but as for the manufacturer, brand integrity, uniformity and consistency throughout the franchise system is essential.

Language in parties' agreements should strive to be free of any ambiguity.  Once in a contractual relationship, the parties are also prohibited from taking any steps that might frustrate the other party's performance under the agreement.  Many such agreements, like the one in this case, have "due cause" clauses, providing franchisors with the right to terminate if the franchisee breaches under certain circumstances.

The Court is now faced with determining whether Plaintiff breached several material provisions of the agreement, giving rise to MMNA's right to terminate as a matter of law. In doing so, the Court must undertake a careful review of the specific provisions at issue.  This leaves open the threshold question of whether the conduct complained of by MMNA is indeed prohibited by the agreement.  In addition, the Court is to determine whether Defendant acted in bad faith and without due cause when it refused to consider Plaintiff's agreement to sell the

---

[1] *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (quoting 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 30:6 (4th ed. 2012).

dealership and instead suggested another proposed buyer.[2]  Needless to say, the parties sharply dispute whether Plaintiff materially breached the agreement and whether Defendant acted in bad faith.[3]

Now, before the court is Defendant's Motion for Summary Judgment on all counts (DE 21-6), Plaintiff's opposition to Defendant's motion (DE 22-15), and Defendant's reply to Plaintiff's opposition to this motion (DE 21-3).  Oral argument was heard on May 2, 2023. (DE 25.)

For the reasons that follow, Defendant's Motion for Summary Judgment is hereby **GRANTED.**

---

[2] *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) ("All contracts under New York law include" the covenant of good faith and fair dealing.).

[3] The Court commends counsel on both sides for excellent paper submissions and presentations at oral argument.

## UNDISPUTED MATERIAL FACTS[4]

Plaintiff Kings Autoshow, Inc., and Defendant MMNA executed an agreement on October 29, 2021, to continue for three years.[5]  *See* (DE 21-5 at ¶¶ 1-2); *see also* § I of Dealer Sales and Service Agreement executed on October 29, 2021 (the "Agreement") (DE 22-3).  The Agreement contained "Standard Provisions" which were incorporated by reference into the Agreement itself and contained language regarding termination.  (*Id*.)

On June 28, 2022, Plaintiff entered a Consent Order in which it pled guilty to the New York City Department of Consumer and Worker Protection's ("DCWP") 13-count petition.  (DE 21-5 at ¶¶ 4-6.)  As a result, Plaintiff was obligated to pay over $500,000 in civil penalties and $304,901.54 in restitution.  (*Id*. at ¶ 7.)  It was also prohibited from selling used cars from July 3, 2022 to July 9, 2022.  (*Id*. at ¶ 8.)

On July 28, 2022, Defendant sent Plaintiff a Notice of Termination letter after learning through a public news article about Plaintiff's conduct.  (*Id*. at ¶¶ 9, 11.)  On September 12,

---

[4] Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement throughout this Report and Recommendation means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it.  Where relevant, however, the Court may cite directly to an underlying document.  The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal.  *See Stewart v. Fashion Inst. of Tech*., No. 18-cv-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.") (quoting *Knight v. N.Y.C. Hous. Auth*., No. 03 Civ. 2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be specifically controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything.").  Further, to the extent a party improperly interjects arguments and/or immaterial facts in response to facts asserted by the opposing party, and does not specifically controvert such facts, the Court disregards those statements. *See McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020) (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)).

[5] The undersigned notes that page nine of the Sales and Service Agreement outlines the protocols to be followed if the dealers open a related business, such as to notify Defendant, but it is silent as to whether Dealers are prohibited from operating other businesses generally.  (DE 22-3 at 8-9.)

2022, Plaintiff sent a letter to Defendant expressing its dismay at the news that Defendant planned to terminate their Agreement and even offered alternatives to rectify the situation.  (*Id.* at ¶ 12.)  However, despite this letter, on September 19, 2022, Defendant sent a response to Plaintiff stating it still intended to terminate. (*Id.* at ¶ 13.)  Plaintiff then sought to sell the dealership.  (*Id.* at ¶ 14.)

On October 26, 2022, Plaintiff entered into an Asset Purchase Agreement ("APA") with an individual named Richard Osiashvili.  (*Id.* at ¶ 15.)  Plaintiff sent the APA to Defendant for its approval, but Defendant did not consider the APA.  (*Id.* at ¶ 16.)  After this, Plaintiff filed suit, which stayed the alleged termination.  (DE 1-2 at ¶ 37); *see also* VEH. AND TRAF. §463.2(e)(1) (stating that if a vehicle dealer receives a notice of termination and an action is brought within four months after the dealer receives notice, then the termination will be stayed until the final judgment is rendered).

## PROCEDURAL HISTORY

On November 22, 2022, Plaintiff filed its complaint in the Supreme Court of New York, Nassau County.  (DE 22-1.)  Plaintiff sought review of Defendant's threatened termination under New York State Vehicle and Traffic Law ("VTL") section 469 whereby Defendant bears the burden of proof to demonstrate that due cause and good faith exist to pursue termination of the Agreement.  *See* VEH. AND TRAF. § 463.2(e)(2).  Plaintiff also alleges that Defendant coerced it into selling the dealership in violation of VTL section 466 and Article 17-a of the Franchised Motor Vehicle Dealer Act.  Thus, Plaintiff concludes that Defendant lacks due cause in pursuing termination of the Agreement because there was no material breach and lacks good faith in both refusing to consider the APA and proposing Victory Mitsubishi as the suggested buyer.  (DE 22-

1 at 6.)  This, it argues, amounts to an "unreasonable restriction[] on the franchised motor vehicle dealer relative to transfer, [or] sale…of a franchise…."  VEH. & TRAF. § 466; (DE 1-2 at ¶ 44.)  Furthermore, Plaintiff argues that Defendant "maliciously and intentionally interfered" with its contractual relationship with the new buyer.  (DE 1-2 at ¶ 55.)  As part of its damages, Plaintiff seeks to have the termination declared null and void, continue business operations with Defendant as part of the Agreement, and award Plaintiff costs and fees.  (DE 1-2 at 8.)

On December 2, 2022, Defendant removed the action to this Court.  (*Id.*)  Defendant filed its Answer on December 19, 2022, stating that in its defense, it issued the Notice of Termination with due cause and in good faith only after it became aware of the DCWP's Consent Order with Plaintiff.  (DE 10 at 14-15.)  In addition, Defendant argues that Plaintiff's claims fail because it neither needed to consider nor approve the request to transfer since the Notice of Termination had already been issued.  (*Id.* at 15.)  Finally, Defendant counters that the incurable breaches of the Agreement gave it due cause to issue the Notice of Termination and this decision was made in good faith.  (*Id.*)

The parties have exchanged Rule 26(a)(1) disclosures, served and responded to first interrogatories and document demands, and met and conferred regarding 30(b)(6) depositions. (DE 19.)  On January 13, 2023, Defendant filed a pre-motion letter for the instant motion.  (DE 20.)  The Court set a briefing schedule and hearing on the motion and parties submitted their papers accordingly.  (DE 21, 22.)  Oral argument was heard on May 2, 2023.[6]

Defendant seeks summary judgment on the following grounds, claiming no issues of fact remain for trial: (1) Plaintiff materially and incurably breached the Agreement, giving Defendant due cause to terminate; (2) Defendant was not compelled to consider Plaintiff's request to

---

[6] *See generally* Transcript of oral argument, *Kings Autoshow, Inc. v. Mitsubishi Motors of North America, Inc.*, No. 22-cv-7328 (JMW) (E.D.N.Y. May 2, 2023) (DE 25).

approve the dealership transfer given that the Notice of Termination was already issued; and (3) Plaintiff's contractual interference claim is meritless.  (DE  21 at 7-18.)

## **LEGAL STANDARD**

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim.  *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  Once the movant meets its initial burden, the nonmovant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002).  "The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts."  *Sosa v. New York City Dep't of Educ.*, 406 F. Supp. 3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted).  The role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely to undertake an analysis to identify whether triable issues of fact exist.  That is, the court's function is "issue-finding," not "issue-resolution."  *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)).

It is against this backdrop that the Court considers Defendant's motion for summary judgment.

## DISCUSSION

### A. Whether the Agreement Applies to Both New *and* Used Cars

The threshold issue presented is whether the Agreement applies to "used" car customers. Plaintiff argues that the Consent Order exclusively related to its used car business and that the Agreement only applies to new vehicle sales. (DE 22-15 at 6, 7.)  Defendant opposes, stating that the Agreement applies to sales to all customers, new and used.  (DE 21-3 at 3.)

In interpreting contracts, the New York Court of Appeals has stated,

> This Court has held that "'reasonable expectation and purpose of the ordinary business[person] when making an ordinary business contract'" serve as the guideposts to determine intent (*Album Realty Corp. v. American Home Assurance Co.*, 80 N.Y.2d 1008, 1010, 592 N.Y.S.2d 657, 607 N.E.2d 804 (quoting *Bird v. St. Paul Fire & Mar. Ins. Co.*, 224 N.Y. 47, 51, 120 N.E. 86)). Thus, the "tests to be applied * * * are common speech * * * and the reasonable expectation and purpose of the ordinary business[person]," in the factual context in which terms of art and understanding are used, often also keyed to the level of business sophistication and acumen of the particular parties (*Ace Wire & Cable Co., Inc. v. Aetna Casualty & Surety Co.,* 60 N.Y.2d, at 398, 469 N.Y.S.2d 655, 457 N.E.2d 761; *see*, *Michaels v. City of Buffalo*, 85 N.Y.2d 754, 757, 628 N.Y.S.2d 253, 651 N.E.2d 1272; *Miller v. Continental Ins. Co.*, 40 N.Y.2d 675, 676, 389 N.Y.S.2d 565, 358 N.E.2d 258).

*Uribe v. Merchants Bank of N.Y.*, 693 N.E.2d 740, 743 (N.Y. 1998).

That is, courts are obligated to examine the contract as a whole and interpret its parts with reference to the whole.  *See* 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 32:5 (4th ed. 2012) (stating that contracts must "be read as a whole and every part will be read with reference to the whole"); *see also Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract."); *Bailey v. Fish & Neave*, 868

N.E.2d 956, 959 (N.Y. 2007) ("Agreements should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases.").

Simply offering differing interpretations of a contractual provision does not mean that the provision is ambiguous. In the summary judgment context, if the Court finds the existence of ambiguities, then an award of summary judgment is inappropriate. *See Dev. Specialists, Inc. v. Peabody Energy Corp. (In re Coudert Brothers)*, 487 B.R. 375, 390 (S.D.N.Y. 2013) ("Generally, summary judgment is appropriate in a contract dispute only where the contract's terms are unambiguous, whereas 'interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder.'") (citations omitted). The Court next turns to the parties' positions, which are polar opposite.

Plaintiff argues that the Agreement does not apply to its sale of used cars (DE 22-15 at 6), relying in particular on several key provisions in the Agreement itself that refer to the products as "new." (DE 22-15 at 6.) Specifically, Plaintiff contends that the purpose of the Agreement— which is to "provide for the sale and servicing of *MMNA Products* in a manner that will best serve [all parties'] interests"—does not extend to used vehicles. (DE 22-3 at 1.) In fact, it points to 'MMNA Products' which it says only refers to new cars or trucks and new parts and accessories. (DE 22-15 at 7.); (DE 22-3 at 13.) Furthermore, posits Plaintiff, the Consent Order only addressed Plaintiff's used car sales and prohibited Plaintiff from selling used cars for only seven days. (DE 22-15 at 7.)

Defendant argues that per the Agreement, Plaintiff's transactions would include used cars and Plaintiff would use the same name to sell both used and new cars. (DE 21-3 at 4.) Nowhere in the Agreement does it suggest that Plaintiff does not have the same obligations to both used

and new car customers.  (*Id.*)  It would be *absurd*, Defendant asserts, for Plaintiff to think it could defraud used car customers, just because they are not covered in the Agreement.  (*Id.* at 5.)

Contrary to Plaintiff's contentions, there are in fact several provisions in the Agreement in which the word "used" is referenced:

- Section 6, Dealership Premises: "**MMNA** has approved the following premises as the location of **Dealer's** MMNA sales and service operations (hereinafter referred to as the "*Dealership Premises*")" and lists the *"Used Vehicle Display and Sales Facilities*" with the address 5910 Church Ave, Brooklyn, New York 11203.

- Standard Provisions, § IV. Dealership Premises, subsection C: "If **Dealer** or any of **Dealer's** *Owners or Executive Managers* should have or should acquire, directly or indirectly, for themselves or for members of their respective families, any substantial interest in an enterprise the business of which is in any way connected with *new or used MMNA Products (hereinafter referred to as "Related Business")*, or any property which is being used or will be used in connection with new or used MMNA Products (hereinafter referred to as "Related Property"), or any beneficial interest in any Related Property, **Dealer** will…."

- Standard Provisions, § VIII. Servicing MMNA Vehicles, subsection A(6): "…In the event that the laws of the state in which **Dealer** is located require motor vehicle dealers or distributors to install in *new or used motor vehicles*, prior to the retail sale thereof, any safety devices or other equipment not installed or supplied as standard equipment by **MMNA**, then **Dealer**, prior to its sale of any MMNA Vehicles on which such installations are so required, shall properly install such equipment on such MMNA Vehicles. **Dealer** shall comply with all state and local laws pertaining to the installation requirements of any such equipment including, without limitation, the reporting of such installation. **MMNA** shall not be liable for any failure of **Dealer** or its employees to comply with such state and local laws."

- Standard Provisions, § General Provisions, subsection A: "**Dealer** shall defend and indemnify **MMNA** and any manufacturer of MMNA Products and hold each of them harmless from any and all liabilities that may be asserted or arise by reason or out of: (a) **Dealer's** failure or alleged failure to comply, in whole or in part, with any obligation assumed by **Dealer** pursuant to this Agreement; (b) **Dealer's** negligent or improper, or alleged negligent or improper, repairing or servicing of *new or used MMNA Vehicles* or equipment, *or such other motor vehicles or equipment as may be sold or serviced by Dealer*; (c) **Dealer's** breach, or alleged breach, of any contract between **Dealer** and **Dealer's** customer; or (d) **Dealer's** misleading statement or misrepresentation, or alleged misleading statement or misrepresentation, either direct or through advertisement, to any customer of **Dealer**. This indemnification shall include all attorneys' fees, court costs and expenses incurred by **MMNA** and/or any manufacturer of *MMNA Products* in defending any claim or suit asserted as a 30 result of the foregoing."

10

(DE 22-3 (emphasis added).)

At the heart of the parties' arguments are several key provisions of the Agreement. Standard Provisions section I pronounces that, "**Dealer** shall engage in no discourteous, deceptive, misleading or unethical practices and shall actively promote the sale of *MMNA Products*. **Dealer** shall give prompt, efficient and courteous service to all customers of *MMNA Products* whether or not those customers purchased *MMNA Products* from **Dealer**."  (*Id*. at 13.) Section X of the Standard Provisions in the Agreement states that Defendant may terminate dealer by giving 30 days prior written notice to Plaintiff for any of the following reasons:

- Section X(B)(2)(a): "Failure of **Dealer** to obtain or maintain any license, or the suspension or revocation of any license, necessary for the conduct by *Dealer* of its business pursuant to *this Agreement*;" or

- Section X(B)(2)(g): "Impairment of the reputation or financial standing of **Dealer** or any of its management subsequent to the execution of *this Agreement*, or ascertainment by **MMNA**  subsequent to the execution of *this Agreement* of any fact existing at or prior to the time of execution of *this Agreement* which tends to impair the reputation or financial standing of **Dealer** or any of its management and which would substantially impair the operation of the dealership;" or

- Section X(B)(2)(h): "Any submission by **Dealer** to **MMNA** of a false or fraudulent dealership application report, statement or claim for reimbursement, refund, credit, or financial information, or submission to a customer of a false or fraudulent report or statement of any kind, including but not limited to statements concerning pre-delivery preparation, testing, servicing, repair or maintenance;" or

- Section X(B)(2)(l): "Failure to **Dealer** to maintain good relations with its customers, including, but not limited, failure to notify **MMNA** of complaints by customers and repeated failure to properly resolve customer complaints as required under Section VIII.B.4. hereof…."

(*Id*. at 33-35.)

The above provisions undoubtedly apply to *both* used and new car customers.  A plain reading of all of the provisions leads to no other conclusion.  Plaintiff's proffered interpretation

of stand-alone provisions without reading the Agreement as a whole is nothing short of an acrobatic attempt to avoid basic rules of contract interpretation.

Reading the Agreement as a whole as this Court is obligated to do, and without cherry-picking provisions, it is evident that the parties contemplated that the obligations and rights in the Agreement apply to *all* types of vehicle sales.  For example, section I of the Standard Provisions explicitly states that parties are to refrain from engaging in "discourteous, deceptive, misleading or unethical practices" without limitation to new MMNA products.  (*See id*. at 13.)

Further, Standard Provision section X(B)(2)(g), does not limit the impairment or financial standing to new car transactions.  There is simply no limiting language, yet the Agreement in many provisions refers to "new" or "used" cars.  *See supra.*  Section X(B)(2)(h) provides for termination of  "any" false or fraudulent report/statement can implicate *all* car transactions.  Finally, section X(B)(2)(l) obligates Plaintiff to maintain good relations with *all* customers, again, with no limitation on new car customers only.

During oral argument there was a dispute as to whether the Agreement allows for Plaintiff to operate a separate business.  (DE 25 at 30-37.)  Defendant argued that there was no such provision, while Plaintiff contended that the Agreement contemplated a separate agreement if Plaintiff wished to engage in a separate business, here a used car business.  Plaintiff argued that because parties never exchanged a separate agreement, the Agreement only concerns new cars.[7]

---

[7] To support its contention, Plaintiff turns to section IV(C), which discusses situations in which "Dealer or any of Dealer's Owners or Executive Managers …acquire, directly or indirectly, for themselves or for members of their respective families, any substantial interest in an enterprise the business of which is in any way connected with new or used MMNA Products… or any property which is being used or will be used in connection with new or used MMNA Products…or any beneficial interest in any Related Property." (DE 22-3 at 20.)

However, Plaintiff's argument is nothing short of fallacious.  The fact that there is no separate agreement means that the Agreement at issue governs *all* vehicle transactions—both used and new.  Section IV(C), the provision upon which Plaintiff relies, simply does not apply. That provision discusses drafting a separate written instrument if Dealer, Dealer's owners, or executive managers wish to gain a substantial interest in a business enterprise bearing some relationship with MMNA Products.  (DE 22-3 at 20.)  Dealer admittedly held no substantial interest in any other company.  The provision is for wholly new entities—not those operating under the same name but selling new versus used cars.

Because the relevant provisions of the Agreement are not ambiguous and can be read as applying to all customers, there is no question of fact as to whether the Agreement applied to used cars.

### B.  Whether the Notice of Termination was Issued with Due Cause

Because the Agreement applies here, the next step is to determine whether any questions of fact exist as to Plaintiff's alleged material breach, which would have provided Defendant with due cause to terminate the Agreement.

Plaintiff and Defendant entered into an Agreement under which Plaintiff would have the nonexclusive right to sell and service Mitsubishi cars and sell related parts, accessories, and options.  (DE 22-3 at 1.)  However, Defendant argues that Plaintiff materially breached several provisions of the executed Agreement.

"Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."  *Belsito Commc'ns, Inc. v. Dell, Inc*., No. 12-CV-6255, 2013 U.S. Dist. LEXIS 130598, 2013 WL 4860585, at *7 (S.D.N.Y. Sept. 12, 2013).

Furthermore, "[m]aterial breach must be of a reasonable and necessary provision of a franchise if the breach is not cured in a reasonable time after written notice of the breach was received." *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, No. 13-CV-0520, 2013 U.S. Dist. LEXIS 67795, at *7 (E.D.N.Y. May 2, 2013). "Material breach is one that may cause the aggrieved party to revoke or terminate the agreement without giving them an opportunity to cure." *Id*. at *8.

According to New York's Vehicle and Traffic Law, the Notice of Termination from a franchisor must be issued with due cause and in good faith. N.Y. VEH. & TRAF. L. § 463(2)(e)(2). "In…an action under [463((2)(e)(2)] the franchisor bears the burden of demonstrating both 'that due cause and good faith exist' and 'that all portions of [the] . . . sales and service requirements for the protesting franchise[e] . . . are reasonable.'" *Agar Truck Sales, Inc v. Daimler Trucks N. Am., LLC*, No. 13-cv-5471 (NSR), 2014 U.S. Dist. LEXIS 45429, at *10 (S.D.N.Y. Apr. 1, 2014). "To establish due cause, the franchisor must prove "a material breach by a new motor vehicle dealer of a reasonable and necessary provision of a franchise [and that] the breach [was] not cured within a reasonable time after written notice of the breach ha[d] been received from the manufacturer or distributor." *Maltbie's Garage Co. v. GM LLC*, No. 21-CV-581 (MAD) (TWD), 2021 U.S. Dist. LEXIS 205914, at *10-11 (N.D.N.Y. Oct. 26, 2021).

As such, the Court looks to each of the provisions that Defendant has alleged that Plaintiff materially breached to determine whether a question of fact exists as to whether Defendant had due cause to issue the Notice of Termination. (DE 22-3 at 33-34.)

### i. Engaging in Unfair and Deceptive Practices

Standard Provision § I: General Obligations states that the "[d]ealer shall engage in no discourteous, deceptive, misleading or unethical practices and shall actively promote the sale of *MMNA Products*. **Dealer** shall give prompt, efficient and courteous service to all customers of

14

*MMNA Products* whether or not those customers purchased *MMNA Products* from **Dealer.**"
(DE 22-3 at 13.)

Here, it is undisputed that Plaintiff engaged in deceptive practices.  In fact, it entered into
a Consent Order with the DCWP defining literally thousands of deceptive acts to which it
ultimately pled guilty to all.  (*See* DE 22-5) (noting that Kings engaged in deceptive trade
practices of at least 7,939 violations).  Specifically, Plaintiff confessed that it falsely advertised
vehicles, and that it engaged in deceptive business practices such as (1) misrepresenting vehicles'
condition; (2) falsely stating that vehicles required repairs; and (3) failing to disclose legal names
in receipts and bills of sale.  (DE 22-4 at 56-66.)  Because Plaintiff committed numerous
deceptive acts and defrauded consumers, there is no material issue of fact that Plaintiff materially
breached this provision if the provision is interpreted as applying to both used and new car
customers.

This clause applies to a used car customer as well—a plain reading of this clause
indicates that Plaintiff shall not engage in discourteous conduct relating *any* vehicle sale.  (DE
22-3 at 13.)  ("Dealer shall engage in no discourteous, deceptive, misleading or unethical
practices….")  Further, Plaintiff's use of the Mitsubishi name is for all customers that purchase
Plaintiff's vehicles; the customers are likely unaware of the distinction between used and new
cars.  Indeed, this was conceded to at oral argument by Plaintiff's counsel.  (DE 25 at 29) (Q:
"But the point is that your client didn't use the same name to do both businesses and even though
the misleading and deceptive practices were in connection with used sales, it was still the entity,
the dealer, who's part of this Agreement that was guilty, found guilty, or pled guilty.  It's the
same entity, right? A: In – yes. Yes.")  Thus, engaging in deceptive acts would globally apply to
all customers and constitute a material breach of the Agreement.

### ii.    License Suspension

Section X(B)(2)(a) states that "[f]ailure of **Dealer** to obtain or maintain any license, or the suspension or revocation of any license, necessary for the conduct by **Dealer** of its business pursuant to *this Agreement*…"  (DE 22-3 at 33.)

Plaintiff argues that this license suspension was for used cars, and so they did not breach the Agreement.  (DE 22-15 at 8.)  Even if it did breach the Agreement, it was not a *material* breach, as it was only for a week and then cured, and Plaintiff was able to sell again thereafter. (*Id*. at 8-9.)  Furthermore, Defendant did not learn of the license suspension until a week after the suspension was over.  (*Id*. at 9.)  Thus, as of the Notice of Termination letter dated July 28, 2022, there was no breach.  (*Id*.)

Here, notwithstanding Plaintiff's assertions, Plaintiff breached the Agreement in having its license suspended or revoked.  The license suspension is not disputed.  Rather, mitigating circumstances are offered to excuse the breach.  After the June 28, 2022, Consent Order was executed and Plaintiff's license was suspended for one week, Plaintiff failed to notify Defendant pursuant to the Agreement.  Instead, Defendant found out on its own, through a public news article, that Plaintiff committed numerous Consumer Protection Laws violations and was forced to pay thousands of dollars in civil penalties.  For those reasons, Plaintiff breached the provision.

### iii.    Impairing the Reputation of Plaintiff and Management

Section X(B)(2)(g) provides that the "[i]mpairment of the reputation or financial standing of **Dealer** or any of its management subsequent to the execution of *this Agreement*, or ascertainment by **MMNA**  subsequent to the execution of *this Agreement* of any fact existing at or prior to the time of execution of *this Agreement* which tends to impair the reputation or financial standing of **Dealer** or any of its management and which would substantially impair the operation of the dealership…."  (DE 22-3 at 34) (emphasis added).

16

Plaintiff argues that Defendant has not offered proof of this, *i.e.,* lost business opportunities. (DE 22-15 at 9-10.) Further, the public news article that Defendant cites does not show that its reputation or financial standing was impaired. (*Id*. at 10.) Defendant responds that it does not need to show its reputation was impaired by Plaintiff's fraud, but that Plaintiff's reputation was impaired when it pled guilty to the violations. (DE 21-3 at 5.)

*Giuffre,* a case upon which Defendant heavily relies, is factually similar and persuasive here. In *Giuffre*, the court granted defendant's motion for summary judgment and denied plaintiff's restoration of the dealership. *Giuffre Hyundai, Ltd*., 2013 U.S. Dist. LEXIS 67795, at *1. There, defendant terminated the dealership after discovering that plaintiff engaged in fraudulent and deceptive practices, such as strong-arming customers, preying on disadvantaged customers, and providing higher prices for cars at checkout, resulting in a $500,000 restitution payment. *Id.* at *1-2. The agreement contained provisions (1) requiring the dealer to treat customers fairly and "not engage in any deceptive or fraudulent practices" and (2) stating that a material and incurable breach occurred if there was a legal violation, including a "finding or adjudication…that Plaintiff has engaged in misrepresentations or unfair deceptive trade practices." *Id.* at *2, 5.

The plaintiff in *Giuffre* challenged the notice of termination and sought to reinstate its business, alleging that defendant did not give it an opportunity to cure, acted in bad faith in its termination, and restricted it from transferring its rights. *Id.* The court ultimately found that the deceptive acts constituted a material breach and thus an opportunity to cure was not necessary. *Id.* at *10. The Second Circuit affirmed the grant of summary judgment in defendant's favor, ruling that Hyundai need not continue its business relationship with the dealer. *Giuffre,* 756 F.3d at 210.

Here, Plaintiff is correct that the current Agreement has no provision allowing Defendant-franchisor to terminate the Agreement because it violated a law.  However, the Agreement's provision sets a "lower standard" than that in *Guiffre.*  The agreement in *Guiffre* only deemed conduct a material and incurable breach if there was a legal violation. *Giuffre Hyundai, Ltd.*, 2013 U.S. Dist. LEXIS 67795, at *2,5.  However, here *any* discourteous, deceptive, misleading, or unethical practice breaks Plaintiff's general obligation—it need not be a legal violation.  (*See* DE 25 at 10, 44); (*see also* 22-3 at 13.)  *Au fond*, Plaintiff admittedly engaged in thousands of deceptive business practices.  (*See generally* DE 10-1.)  Thus, like the Court stated in *Giuffre*, Defendant here should not be compelled to continue doing business with Plaintiff in the face of the breach.

### iv.    Submitting False or Fraudulent Reports to Customers

Section X(B)(2)(h) reads "[a]ny submission by **Dealer** to **MMNA** of a false or fraudulent dealership application report, statement or claim for reimbursement, refund, credit, or financial information, or submission to a customer of a false or fraudulent report or statement of any kind, including but not limited to statements concerning pre-delivery preparation, testing, servicing, repair or maintenance."  (DE 22-3 at 34.)

Plaintiff argues that the buyers of used cars are not "customers" under the Agreement, so there is no breach.  (DE 22-15 at 10.)  It further states that a question of fact still applies to breach since, according to the Agreement, Defendant can terminate if Plaintiff submits to a customer a false or fraudulent report or statement.  Here, however, all of the documents at issue relate to customer safety.  (*See* DE 22-3 at 22; DE 22-15 at 10-11.)  Defendant counters that Plaintiff conducted all business under the Brooklyn Mitsubishi name and its obligations under the Agreement applies to all transactions—new *and* used cars.  (DE 21-3 at 6.)

18

The Court finds Plaintiff's argument to be meritless.  Plaintiff failed to let its customers know that certain cars were not in working condition.  In the Second Amended Petition from the DCWP, the DCWP outlines at least four situations in which Plaintiff gave a false report to customers by misrepresenting defective vehicles as being "roadworthy."  (DE 22-4 at 39-41.); (*id.* at 66) (noting that Brooklyn Mitsubishi violated the CPL by misrepresenting that the used vehicles it told to four customers were "roadworthy and by failing to disclose material defects about which it knew or should have known and which rendered those vehicles unfit for ordinary use").  And all of the business was conducted under the Brooklyn Mitsubishi name.  Further, the language in section X(B)(2)(h) does not appear to limit the false or fraudulent reports or statements to safety alone because of the "including but not limited to" language.  Therefore, there is no genuine issue of material fact that Plaintiff breached this provision.

### v.   Failing to Maintain "Good Relations" With Customers

Section X(B)(2)(l) provides that "[f]ailure to **Dealer** to maintain good relations with its customers, including, but not limited to, failure to notify **MMNA** of complaints by customers and repeated failure to properly resolve customer complaints as required under Section VIII.B.4. hereof…."  (DE 22-3 at 34.)

Plaintiff argues that the term "good relations" is ambiguous in the Agreement as 'good' could mean ethical or satisfactory.  (DE 22-15 at 11-12.)  However, Defendant counters that the Agreement covers *all* customer relations—new and used car customers and "good relations" is not ambiguous.  (DE 21-3 at 6-7.)  Defendant asserts that the reason for termination of the Agreement was Plaintiff's repeated failure to properly resolve customer complaints and Plaintiff subsequently pled guilty to the violations.  (*Id.*)

While the term "good relations" may be vague or ambiguous, the deceptive acts that Plaintiff engaged in related to its advertisements, warranty rights, financing terms, license

19

applications, and misrepresentations about the roadworthiness of the vehicle were not. Such acts run counter to maintaining good relations with its customers. (*See* DE 22-5.) Thus, there is no genuine dispute of material fact that Plaintiff breached this provision.

### C. Whether or Not the Breaches Were Incurable

Defendant argues that the breach of the Agreement was not curable. (DE 21-6 at 11-13.) Specifically, it asserts that Plaintiff here committed many acts of unfair and deceptive dealing and practices with customers, causing irreparable reputational harm to Mitsubishi. (*Id.*)

"When a breach involves deceptive conduct that goes to the essence of the contract and fundamentally destroys the parties' relationship, it may not be subject to cure." *Giuffre Hyundai,* 2013 U.S. Dist. LEXIS 67795, at *9. "New York law permits a party to terminate an agreement immediately without notice and an opportunity to cure when 'the misfeasance is incurable and when the cure is unfeasible.'" *Id.* at *9-10.

In *Guiffre,* the court found that the action brought by the State Attorney General as well as the Supreme Court's findings constituted a "reputation poisoning" which gave defendant the ammunition it needed to terminate the agreement. 2013 U.S. Dist. LEXIS 67795, at *11. And the court mentioned that if Hyundai had not terminated the agreement, the public's trust in Hyundai would be eroded. *Id.*

Section X(C) of the Standard Provisions incorporated into the present Agreement states that "Any notice of termination by **MMNA** shall inform **Dealer** of the grounds therefor, and any such notice may be withdrawn if during the applicable notice period **Dealer** cures to **MMNA's** satisfaction the condition or conditions upon which the notice is based." (*See* DE 22-3 at 35-36.)

Here, Plaintiff's contention that Defendant failed to provide it with an opportunity to cure is meritless because the breaches and resulting reputational harm were "incurable."[8]  The acts to which Plaintiff pled guilty to by definition cannot be cured.  A promise not to do the same in the future is not a cure for a past default.  Plaintiff engaged in deceptive acts, which is evident from its pleading guilty to numerous violations instead of protesting any of the DCWP's findings. (*See generally* DE 22-5); *Giuffre*, 756 F.3d at 211 (finding that dealer's failure to appeal the findings of deceptive conduct constituted "an adjudicated fact")*.*  The very essence of this contract is to sell and service motor vehicles, which can only be done with good relations with customers.  *See Giuffre*, 2013 U.S. Dist. LEXIS 67795, at *11 (stating that public trust in the manufacturer is "essential for a successful vendor of automotive products").  Engaging in the thousands of violations could have caused permanent damage to both parties.  All vehicle sales occurred under the "banner" of Mitsubishi, the very company name under which it pled guilty. (DE 25 at 54-55.)  Thus, Plaintiff need not be given "a second chance" after a serious deviation from its obligations, such as this one, occurs.  *Giuffre*, 2013 U.S. Dist. LEXIS 67795, at *12.

Further, Plaintiff's response to the Notice of Termination Letter in the September 12, 2022 letter is essentially an admission in that Plaintiff did not deny any of the alleged conduct nor did it state that it in fact did *not* breach the Agreement.  (DE 22-7.)  Rather than challenging Defendant's Notice of Termination, Plaintiff instead offered possible remedies to change Defendant's mind, including changing the name of the facility, relocating its showroom of new Mitsubishi products to another building, and re-marketing themselves, and entering a

---

[8] Indeed, during Oral Argument, Plaintiff argued that the provision in *Giuffre* provided for "adjudicated misfeasance" rather than simple misconduct, which is what occurred here.  Plaintiff argued that *Giuffre* focused on the adjudication, which could not be corrected, but in the instant case, Plaintiff's behavior could be remedied.  (DE 25 at 45, 56-57.)  The Court finds this argument meritless because the DCWP's Consent Order, a fully adjudicated matter, was premised on the very misconduct alleged here and resulted in reputational harm for the entire Mitsubishi brand.

probationary period.  (*Id.* at 2.)  In effect, the letter, which sought to convince Defendant to reverse its determination, was a *mea culpa.*

Further, contrary to Plaintiff's argument that Defendant has not shown damages concerning reputational harm, it is intuitive that a report laying out thousands of violations committed upon car customers would be fatal to Plaintiff's reputation in the community.  In fact, Defendant discovered these very violations through a public news article, which any one of Plaintiff's customers could have also done.  And a prominent government figure, Mayor Eric Adams, outlined these acts in the article, which diminishes Plaintiff's credibility even further. The provisions in the Agreement, though applying to Plaintiff's reputation, largely exist to prevent sullying Mitsubishi brand altogether.  But here, it is far too late for Plaintiff to provide any remedies to undo the harm.

### D.  Whether the Notice of Termination was Issued in Good Faith

Defendant's issuance of the Notice of Termination was not pretextual as Plaintiff contends.  (DE 25 at 16-18.)  Under the Automobile Dealers' Day in Court Act, a dealer can sue an automobile manufacturer engaged in commerce for failure to act in good faith in terminating the franchise.  *See* 15 U.S.C. § 1222.  To do this, a dealer must show, that the manufacturer coerced the dealer, and that the coercion was calculated to achieve a wrongful objective.  *V.M. Paolozzi Imps., Inc. v. Am. Honda Motor Co*., 2015 U.S. Dist. LEXIS 161422, at *22 (N.D.N.Y. 2015).

Plaintiff points to *Bronx Auto Mall v. Am. Honda Motor Co*.  934 F. Supp. 596 (S.D.N.Y. 1996) to supports its proposition that Defendant's Notice of Termination was a pretext to coerce Plaintiff into selling to Victory Mitsubishi.   (DE 22-15 at 4.)  But that case is inapposite.  There, the court found that defendant, as a pretext, issued the condition to renew by forcing plaintiff to

make unreasonable and substantial renovations of the franchise in violation of VTL section 463(2)(c) such as "expanding and relocating the parts department, adding a dedicated lounge for Acura service customers, and renovating the restrooms."  934 F. Supp. at 609-10.  They also used complaints about plaintiff's facilities "as a pretext to get rid of a dealer it did not want."  *Id.* at 612.  The Court found defendant's primary motives were to "reduce the overall number of dealers" and "eliminate a dealer who cut prices."  *Id.* at 607.

Unlike *Bronx Auto Mall*, where the court found several concealed reasons for terminating the dealership, here, when asked by the Court here to provide supporting information for its pretext argument, Plaintiff repeatedly emphasized Defendant's urging to use Victory Mitsubishi as a buyer.  (DE 25 at 19.)  The Court further probed Plaintiff to point to evidence of pretext *before* the Notice of Termination was issued, but Plaintiff failed to do so and conceded he did not have any such information, but that further discovery could prove otherwise.  (*Id.*)  Unlike Plaintiff, Defendant was equipped with thousands of substantive, *non-pretextual* reasons to decline to renew as per the DCWP's petition.  (*See generally* DE 22-4.)  It thus had no obligation to consider any documents regarding the sale of dealership after the Notice of Termination was issued.

Thus, the Court finds Plaintiff's argument to be without merit and that Defendant's issuance of the Notice of Termination was served in good faith.  Defendant should not be required to continue doing business with an entity that admitted to defrauding its own customers. (DE 21-6 at 13-14.)

23

### E. Whether Defendant Had to Consider the Asset Purchase Agreement and Engaged in Contractual Interference

Finally, because the Court has found that Plaintiff breached the Agreement, it need not reach the remaining contentions of whether Defendant had to consider the APA and whether Defendant engaged in contractual interference.

Plaintiff argues that there is evidence of bad faith here, that is, Defendant failed to consider the APA because it specifically wanted Plaintiff to sell the business to Victory Mitsubishi.  (DE 22-15 at 13-14.)  However, Defendant states that it had no obligation to consider the October 26, 2022 APA once it sent the July 28, 2022 Notice of Termination to Plaintiff after learning of the Consent Order.  (DE 21-3 at 7-9.)

And Plaintiff argues that Defendant interfered with Plaintiff's contractual relationship with Osiashvili by refusing to consider the APA.  (DE 22-15 at 15.)  But Defendant states that Plaintiff and Osiashvili had not formed a binding contractual relationship with Osiashvili, especially since their relationship was conditioned on Defendant's approval of the APA.  (DE 21-6 at 16-18.)

Indeed, during oral argument Plaintiff's counsel was asked whether the case ends if the termination was in fact proper.  Counsel agreed, that if termination was proper then Plaintiff does not have the right to insist Defendant consent and approve the APA.  (DE 25 at 14.)

Thus, because the termination is proper here, as explained above, it follows that that no dispute of material fact exists as to whether Defendant denied considering the APA and whether Defendant engaged in contractual interference.

## <u>CONCLUSION</u>

For the reasons stated herein, Defendant's Motion for Summary Judgment is

**GRANTED**.   The Clerk of the Court is directed to enter judgment accordingly and dismiss the

case.


Dated: Central Islip, New York                    **SO ORDERED:**

   August 14, 2023


   _/S/ James M. Wicks_
   JAMES M. WICKS
   United States Magistrate Judge